## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DEAN J. VAGNOZZI** | : |
| | : **CIVIL ACTION** |
| *Plaintiff* | : |
| | : **Case No.** |
| v. | : |
| | : **JURY TRIAL DEMANDED** |
| **UNITED STATES OF AMERICA** | : |
| | : |
| and | : |
| | : |
| **AMIE BERLIN** | : |
| | : |
| and | : |
| | : |
| **UNNAMED FEDERAL OFFICIALS** | : |
| | : |
| *Defendants* | : |
| | : |

## CIVIL ACTION - COMPLAINT

Plaintiff Dean J. Vagnozzi ("Vagnozzi," "Dean" or "Plaintiff"), by and through his undersigned counsel, hereby files this Complaint against the United States of America, Amie Berlin, and Unnamed Federal Officials (collectively "Defendants") and in support thereof avers as follows:

### I.     NATURE OF THE ACTION

1.     The U.S. Legal System is the greatest in the world because it is built on fairness, process, and the unwavering principle that no person should be condemned without evidence and without being heard. That system works only when the government follows the safeguards designed to protect the innocent. Those safeguards are not technicalities. They are the backbone of due process—the guardrails that prevent federal power from crushing the lives of ordinary citizens. When those safeguards are honored, justice prevails. When they are ignored, the results are not merely procedural missteps; they are human tragedies.

2.     Rarely has there been such a tragedy as preventable, or as profound, as what happened to Dean Vagnozzi ("Dean") and his family.

3.     In this matter, the government did not overlook a complicated fact or miss some hidden document buried in an archive. It overlooked exculpatory evidence that was plainly visible, readily available, and impossible to miss had the most basic mandatory duties been followed. Evidence that showed cooperation. Evidence that showed transparency. Evidence that showed innocence. Evidence that could have—and should have—stopped the destruction of Dean's life before it ever began.

4.     Instead, a group of rogue SEC investigators and enforcement attorneys disregarded mandated duties, departmental guidelines and protocols and egregiously violated the constitutional rights of Dean, resulting in the unwarranted seizure of **all** his assets by way of an *ex parte* pre-judgment attachment without affording him any due process.

5.     The egregious government overreach occurred while the U.S. Securities & Exchange Commission's office in Miami ("SEC") conducted an investigation that resulted in the enforcement action captioned as *SEC v. Complete Business Solutions Group, Inc.,* Case No. 9:20-CV-81205-RAR ("SEC Litigation"), which involved the now infamous Par Funding, a "merchant cash advance" company that purported to provide small business owners cash advances against future account receivables.

6.     In reality, Par Funding was running what was later determined by a court to be a Ponzi scheme for which its principals – several of whom turned out to be members of the Gambino crime family – were criminally convicted.

7.     But contrary to the SEC's faulty assumptions, Dean was not a co-conspirator, or "insider" and had no knowledge of Par Funding's criminal conduct.

8.    Dean Vagnozzi, apart from having an Italian surname, had nothing in common with the criminals that ran Par Funding.  Dean ran a very successful and reputable business for many years before he met the principals at Par Funding.  Par Funding's principals lied to, manipulated, and duped Dean into raising funds for Par Funding's criminal enterprise, which he genuinely thought was a legitimate business.

9.    Nevertheless, the SEC officials assumed, without legitimate basis, that Dean was an "insider" at Par Funding and that he too was a criminal.    In doing so, the SEC's team of investigators ignored internal, mandatory rules, which required the SEC to give Dean prior notice of the investigation and an opportunity to respond to the SEC's false assumptions of his complicity.

10.    Had the SEC investigators from the SEC's Miami office followed proper mandated duties, rather than rushing to premature judgment, Dean would not have sustained the enormous financial, reputational and emotional harm that followed the SEC's seizure of his assets and complete shutdown of his business, of which a substantial part had nothing to do with Par Funding.

11.    Instead, before even speaking with Dean, the SEC summarily and recklessly, under the guise of protecting investors, filed for and obtained an *ex parte* Temporary Restraining Order on July 27, 2020, which froze  Dean's assets, installed a receiver over his business (effectively shuttering its operations), and further precluded Dean from pursuing litigation to clear his name by obtaining an overly broad Litigation Stay Order.

12.    The TRO was based on false, misleading and/or incomplete information concerning Dean's role with Par Funding – it improperly assumed his complicity.  The SEC investigators failed to consider that, like the investors, Dean was also defrauded by Par Funding.

13.    In fact, there was no evidence at all that Dean was a Par Funding insider or that he misused, distributed or improperly withheld investor monies.

14.     The SEC's conduct not only ended Dean's ability to earn a living and defend himself against these reckless allegations, but also directly caused dozens of hard-working employees at Dean's company to lose their jobs.

15.     The SEC's investigators repeatedly overlooked and/or ignored overwhelming material and exculpatory evidence that demonstrates – beyond any doubt – that Dean was innocent.

16.     The exculpatory evidence, the SEC learned years later turned out to exonerate Dean, but by that time, Dean's reputation had already been irreparably harmed and his assets and businesses ruined.

17.     The SEC also ignored that Dean, along with many of his family members and friends, were misled by Dean's lawyers at Eckert Seamans – an Am Law 200 national law firm – on which Dean extensively relied to vet  Par Funding before agreeing to raise funds for the company.  Eckert's partner – a former SEC enforcement attorney – assured Dean and members of his family that raising funds for Par Funding was completely legal, in full compliance with securities laws, and that the firm had performed proper due diligence  on Par Funding and their principals.

18.     In short, Dean was not a fraudster nor an insider as the SEC assumed him to be.

19.     He was an innocent victim of government overreach, good faith reliance on counsel, and a victim of Par Funding's fraud and deceit.

20.     The actions of the SEC officials were not only negligent but constituted a willful abuse of process and violation of Dean's constitutional rights.

21.     To be clear, however, this litigation does not seek to relitigate the SEC Litigation or to contradict Dean's Consent Orders entered in that litigation.

22.    This case is about accountability—the kind of accountability the law demands when the government's conduct inflicts catastrophic harm on a family who deserved better from the system designed to protect them. In a case where the truth sat in plain sight, the failure to look— or even ask for it—cannot be excused. The time has come for the Court to make this right, to reaffirm the principles upon which the justice system stands, and to remedy the egregious wrongs perpetrated by the SEC officials who, while investigating Par Funding leading up to the SEC Litigation, violated Dean's rights and caused irreparable harm.[1]

## II.    PARTIES

23.    Plaintiff Dean Vagnozzi ("Vagnozzi" or "Dean") is an individual citizen and resident of the Commonwealth of Pennsylvania, who, at all relevant times, resided in Collegeville, Pennsylvania.

24.    Defendant, the United States of America, may be served by delivering a copy of the summons and complaint to the United States Attorney for the Eastern District of Pennsylvania and/or by sending a copy via certified mail to the Attorney General of the United States at 950 Pennsylvania Avenue, NW, Washington DC, 20530.

25.    Defendant, Amie Berlin ("Ms. Berlin"), was the lead SEC enforcement attorney assigned by the SEC's Miami Office to lead the investigation of the Par Funding case.

26.    Defendants, unnamed federal officials, including investigative or law enforcement officers, are other yet unknown government employees who, together with Berlin, violated Plaintiff's constitutional rights.

---

[1] Plaintiff has exhausted his remedies as he has submitted a Standard Form 95 submission, and more than six months have passed without any agency response.

### III.    JURISDICTION AND VENUE

27.    This Court has jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. § 1346(b)(1) and 28 U.S.C. §§ 2671–2680, as this is a civil action against the United States of America seeking money damages for injury caused by the negligent and wrongful acts and omissions of employees of the federal government acting within the scope of their employment.

28.    Venue is proper in this District under 28 U.S.C. § 1402(b) because the acts and omissions giving rise to this claim occurred in the Eastern District of Pennsylvania, where Plaintiff resides and where the injury was suffered.

### IV.    FACTS COMMON TO ALL COUNTS

29.    On Friday, July 24, 2020, without warning, the United States Securities and Exchange Commission (the "SEC") — through the reckless investigatory actions of its Miami Regional Office staff, including investigatory and/or law enforcement agents, and attorney Amie Berlin—set in motion events that destroyed the life and livelihood of Dean Vagnozzi .

30.    Days after the filing of a Complaint, the SEC obtained a Temporary Restraining Order ("TRO") from Judge Rodolfo Ruiz on July 27, 2020, based on a distorted, incomplete, and misleading presentation of the facts, which falsely and maliciously accused Dean of being complicit in Par Funding's fraud. The SEC's conduct as to Dean was an astonishing abuse of the SEC's investigative and enforcement process.

31.    The TRO was overly broad and placed a stay on the operations of all Dean's businesses, including his life insurance business, which was not even related to any Par Funding investments.

32.    On Tuesday, July 28, 2020, a court-appointed receiver arrived unannounced at Dean's office, ordered him, his son, his sister, his father-in-law, and the rest of his staff into the conference room, and told them to leave immediately.

33.    Dean's business, Abetterfinancialplan.com, LLC, which he had carefully built over seventeen (17) years, was effectively shut down and placed out of business.

34.    The next morning, Dean discovered that all his personal and business assets were frozen.

35.    He and his wife had eighty (80) dollars in cash and zero access to other monetary funds.

36.    At 5:30 a.m. on July 30, 2020, an employee texted Dean a link to a front-page local news article branding him a fraud — a reputation-destroying headline published to thousands and published before Dean had even been given a chance by the SEC to respond to the SEC's allegations in court.

37.    In a matter of less than forty-eight (48) hours, Dean was wrongfully robbed of his ability to earn a living, to access any money to pay for living expenses, and had his reputation destroyed.

38.    With the filing of the TRO, Dean's world was suddenly turned upside down, and became a living nightmare for his whole family.

39.    By freezing all of Dean's assets, his ability to finance a defense was compromised. By prohibiting access to his business records with the appointment of a receiver, Dean was handcuffed from obtaining the very e-mails, texts, and documents that proved his innocence or provided exculpatory evidence. And by obtaining a TRO *ex parte*, based on a misleading, and

incomplete and false narrative, Dean was branded a fraud in the press before he could utter a single word in his defense.

40.    The investigation that provided the basis for the allegations in support of the TRO recklessly failed to establish sufficient facts against Dean for fraud or insider liability.

41.    By way of example only, the SEC accused Dean of not cooperating and falsely advised that "Defendants have not given any assurances against future misconduct and plainly do not believe their conduct is wrong."

42.    Yet, as part of its investigation, the SEC never sought to seek Dean's cooperation, never submitted any Wells Notices to determine his position, and never reached out to his long-term legal counsel John Pauciulo ("Pauciulo").

43.    Instead, the SEC, without considering that Vagnozzi was equally a victim of Par Funding's fraud and deceit, summarily and without substantial investigative evidence, found him guilty by association.

44.    Had the SEC followed its mandated processes, and had it afforded Dean constitutional due process, it would have been discovered that Dean was not involved in Par Funding's fraudulent scheme.

45.    By way of example only, as part of the TRO submission, the SEC falsely accused Dean of concealing regulatory actions by stating that "Vagnozzi acted at least recklessly in not disclosing his own and Par Funding's regulatory history."

46.    This was false.  Dean did disclose his regulatory history in a June 2019 investor meeting (*see* https://vimeo.com/500080454/ac5d19418e) and through a letter, dated June 19, 2019, prepared by his attorney, Pauciulo. (A copy of the June 19, 2019, correspondence, is attached hereto as **Ex. "1."**

47.     Similarly, the SEC further falsely interpreted a Texas regulatory order as having been directed to Dean personally, but the Order only involved Dean's business and only in connection with a management agreement.

48.     Importantly, the Texas regulatory order did not concern any fraudulent conduct involving Dean personally or his business.

49.     In sum, and as set forth more fully below, had the SEC followed its mandated duties, afforded Dean the appropriate constitutional rights, and had not abused the legal process, Dean's business, livelihood, and reputation would not have been destroyed.

**A.     The SEC willfully Ignored Exculpatory Evidence that Dean was not complicit with Par Funding's deceit and fraud on investors**

50.     Despite claiming in the TRO that Dean was somehow an insider, the SEC knew or should have known that this was blatantly false.

51.     Indeed, the idea that Dean "hatched" the scheme of the Agent Funds in response to a 2018 Pennsylvania investigation of Par Funding was utterly false and completely unsupported by documented evidence.

52.     Dean was no insider.

53.     A key component of the SEC's claim that Dean was a Par Funding insider was the SEC's assertion that Dean created the concept of the Agent Fund model to conceal Par Funding's ongoing investigation by the Pennsylvania Department of Banking.  This was a complete fiction that the SEC's staff created without any factual basis.

54.     For one, Dean was unaware that Par Funding was being investigated by the Pennsylvania Department of Banking, until Par Funding's agreement with Pennsylvania was made public in late 2018.

55.    In a Sworn Declaration by Perry Abbonizio ("Mr. Abbonizio"), a Par Funding

principal, he states that:

> The State of PA commenced their investigation into Par Funding on
> January 4, 2018 and it continued throughout most of 2018. ***Dean
> Vagnozzi was never told about this investigation.*** . . . It was alleged
> that once the State of PA commenced their investigation into Par
> Funding, Mr. Vagnozzi worked with Par Funding to create the
> "Agent Fund" model in an effort to conceal information about
> Joseph LaForte and/or Par Funding. ***This also is not true.*** Mr.
> Vagnozzi had very little interaction with anyone from Par Funding
> about the creation of his first fund, and again, ***Mr. Vagnozzi was
> unaware of the State of PA's investigation.***

Declaration of Perry Abbonizio at ¶¶ 3, 6 (emphasis added), attached hereto as **Ex. "2."**

56.    Yet, the SEC failed to obtain this critical information from Mr. Abbonizio prior to

filing the TRO, willfully ignoring pertinent information, in direct violation of its mandatory duties.

57.    The SEC knew full well that the plans to create Agent Funds were recommended

to Par Funding by Dean as early *as 2016* and that the Agent Funds model was rejected by Par

Funding well *before* the 2018 Pennsylvania investigation.

58.    Moreover, the legal structure of creating Private Placement Memoranda ("PPM")

as part of creating the Agent Funds was based on the advice of Dean's legal counsel, Pauciulo.

The Agent Funds and PPM model had nothing to do with Par Funding's Pennsylvania's

investigation or an attempt to conceal it from investors.

59.    In that regard, in or around of June 2016, Pauciulo, at Dean's request, drafted a

PPM for a Fund that planned to "purchase promissory notes issued by one or more companies

which provide merchant case advances to small businesses."

60.    The date on this draft PPM is June 1, 2016, some eighteen months before Par

Funding came under investigation in January 2018 and more than two years before the Par Funding

investigation and deal with the Pennsylvania regulators became public in late 2018.

61.    Dean continued his plans to create Agent Funds throughout 2017. He posted a video online recruiting agents in August 2017 which was uploaded on August 31, 2017 at 11:42 a.m. *See* the timestamp on the image from Dean's private Vimeo page attached hereto as **Ex. "3."**

62.    A few months later, on October 4, 2017, Dean emailed Pauciulo, informing him he wants to proceed with forming "a fund to invest in MCA we started to do last year." *See* October 4, 2017 email attached hereto as **Ex. "4."**

63.    On November 5, 2017, Dean emailed Joe Mack, copying Abbonizio, advising them that his "agent meeting" was "a few days away" and that he was "going to give agents 2 options," explaining the first option would be agents "do their own MCA fund," and the second option was to "sell my MCA fund." *See* November 5, 2017 email to Joe Mack attached hereto as **Ex. "5."**

64.    Dean held his meeting with prospective agents on November 7, 2017, a meeting which Pauciulo (*see* https://vimeo.com/djv42/johnpagents) attended.

65.    By December 16, 2017, Dean had been given the go ahead by Par Funding to create his own investment fund, as well as separate funds to be created by sub-agents.

66.    He reported this to Pauciulo, asking for his assistance "so that I'm not doing anything wrong." *See* December 16, 2017 to Pauciulo email attached hereto as **Ex. "6."**

67.    All the foregoing establishes – beyond any doubt – that Dean was not "hatching" any scheme with Par Funding, rather he was trying to set up funds that would benefit his investors.

68.    The movement to the "Agent Fund" model had absolutely nothing to do with Par Funding's 2018 Pennsylvania investigation, which Dean was completely unaware of.

69.    In fact, all of this evidence – which the SEC investigators ignored – further proves that Dean was a victim of Par Funding's deceit.

**B.**     **The SEC Ignored Dean's Reliance on Counsel Advice**

70.     The SEC also ignored clear evidence that Dean relied on his legal counsel Pauciulo to comply with securities laws.

71.     For legal disclosures, the documentation showed that Dean relied on Pauciulo and Eckert for what disclosures were required in the PPMs.

72.     Yet, the SEC did not contact Pauciulo prior to the filing of the TRO, even though it knew that Pauciulo was Vagnozzi's legal counsel and knew that Pauciulo had submitted Form D Registrations.

73.     Had the SEC contacted Pauciulo, consistent with its mandatory duties, Pauciulo would have advised the SEC that he told Dean that there was no requirement to disclose Joe LaForte's criminal history or to identify Par Funding in the PPMs.

74.     Indeed, Pauciulo assured Dean – as he did directly to investors in multiple videos – that the PPMs and the investment fully complied with all state and federal securities law. *See* **Ex. "7"** (video link compilation of several of Pauciulo's representations and appearances).

75.     Dean expressly asked Pauciulo if Par Funding could be mentioned in the PPM.

76.     In February 2019 – before Dean was about to start his third Fund – Dean wrote an email to Pauciulo asking about the status of the PPM, stating "last week you were not sure if you should mention cbsg [Par Funding] as the main document since the insurance policy will be with them. *I thought you should*. You were not sure." *See* February 26, 2019 email to Pauciulo attached hereto as **Ex. "8."** (emphasis added.)

77.     Pauciulo, however, continued to advise Dean not to mention Par Funding and to keep the PPMs general.

78.     It was thus clear that Dean did not purposely mislead investors about Par Funding. Dean, in fact, advocated to disclose Par Funding in the investor PPMs, but his legal counsel advised him not to.

79.     Yet, the SEC ignored this exculpatory information and failed to advise the Court about it when filing the TRO which seized Dean's assets and businesses before any due process.

**C.     Dean Was Unaware That Par Funding's Default Rates Were False, and When Par Funding Subsequently Defaulted Following Covid, He Did <u>Everything In His Power to Protect His Investors</u>**

80.     That Dean was defrauded by Par Funding is further evidenced by Par Funding's misleading representations about its "default rates" on its merchant cash advances.

81.     The SEC knew that Par Funding provided Dean with spreadsheets representing their merchants' default rates monthly. *See* CBSG Funding Analysis spreadsheet attached hereto as **Ex. "9."**

82.     Those spreadsheets consistently showed default rates under 2%.

83.     Par Funding also supplied Dean with brochures outlining their elaborate underwriting practices, which was represented to be the reason they could achieve a 2% or lower default rate. *See* Par Funding brochure attached hereto as **Ex. "10."**

84.     Dean had no reason to question the default rates since for many years his investors were paid on time and had received the full amount of their principal investment plus the contracted interest.

85.     Mr. Abbonizio confirmed that "Dean Vagnozzi was not privy to any information pertaining to Par's default rates, underwriting practices or number of lawsuits other than what was conveyed to him by Par's management team." *See* **Ex. "2"** at ¶ 7.

86.    When Covid struck in early 2020, Par Funding began to default on its interest payments for the first time.

87.    When Par Funding started to default on interest payments during the early part of the Covid pandemic, Dean – who genuinely believed Par Funding was a fabulous investment for him and his clients – was apoplectic.

As Abbonizio describes it:

> When Par Funding defaulted on March 25, 2020, Dean Vagnozzi had numerous **heated exchanges with Joseph LaForte**.  Mr. Vagnozzi demanded to see Par's financials.  He wanted proof that Par Funding was insolvent before he would sign off on a restructured note for investors.  Dean Vagnozzi was promised no compensation by Par Funding for investors to accept the restructured promissory notes from PAR.

*See* **Ex. "2"** at ¶¶ 9-10 (emphasis added).

88.    A sampling of Dean's text messages exchanged with LaForte on March 25, 2020 – the day Par Funding announced it was defaulting on its payment obligations – fully supports Abbonizio's statements.

89.    At 7:36 AM, March 25, 2020, Dean texted Joe McElhone, "My dad is a retired policeman. He put in 125k. Was supposed to get it back today. Havent called him. Scared. Joe, the sooner you can provide more clarity to people the better. Thanks." *See* text messages to McElhone  attached hereto as **Ex. "11."**

90.     Three hours later, at 10:51 AM, Dean told LaForte, "Joe . . . I'm about to break the hearts [of] over 600 people that are gonna worry like crazy.  Just tell me they will be ok." *Id.*

91.    The next day, after Dean told his clients about the default, he continued to harangue LaForte on behalf of his investors:

> Joe . . . 600 of my clients received email from me an hour ago.  They
> got your letter and a letter that I drafted.  I told them that par funding

is made up of the hardest working people out there. I told them you guys will deliver. I'm receiving a ton of emails back. The majority of them Joe are supportive. That is the good news. I can share some of the emails with you if you wanted to see. Very understanding people. Having said that Joe, some people were supposed to get money the other day. If there is a group of people I'm sympathetic to it's this group. I have one woman that is recently divorced, out of work for 6 months and for months has been telling me how bad she needs her 100k. This woman is losing her mind. I'm not even talking about my dad. Is there anything that can be done for her let me know. The majority of everyone else seems understanding. We appreciate your efforts.

*See* March 26, 2020 text message attached hereto as **Ex. "12."**

92. Dean's text messages with LaForte after Par Funding defaulted clearly show that he was no "insider" and he was legitimately scared for his investors when Par defaulted.

93. There were other representations that Par Funding made to Dean that proved he was defrauded by Par Funding, but the SEC ignored them as well.

94. For example, Par Funding told Dean in 2018 that the company had been audited by Friedman LLP – a large national accounting firm.

95. Par Funding also represented to Dean in 2019 that the company had procured credit insurance from Euler Hermes, which Dean understood was an excellent indicator of the health of Par Funding's business.

96. In fact, Dean was so convinced of Par Funding's abilities, that he was the first to invest his own money in Par Funding, and subsequently had his immediate family and friends invest money in Par Funding. *See* Dean's August 24, 2016 investment check attached hereto as **Ex. "13."**

97. The SEC knew that Dean was no insider at Par Funding, but he had every reason to believe that Par Funding was a solid investment, based on the success of the investments from 2016 through 2019.

98.    Dean was shocked and dismayed at what transpired after March 2020 and did everything possible to protect his investors.

99.    Abbonizio, who was a Par Funding insider, summarized it best:

> In summary, ***Dean Vagnozzi was not an insider with PAR Funding*** and ***I never witnessed him do anything but fight for what was in the best interest of his investors***.  I believe that all of the fraudulent allegations and assumptions made against Mr. Vagnozzi by the SEC's Miami Office . . . were wrong.

*See* **Ex. "2"** at ¶ 11 (emphasis added).

**D.    Prior to The SEC's Shutdown of Dean's Business, Dean Operated a Successful Life Insurance Business for Decades, which had nothing to do with Par Funding and Had Retained Legal Counsel To ensure Compliance with <u>Securities Laws</u>**

100.    Prior to the SEC's shutdown of his business, Dean operated a successful financial services business since 2004.

101.    When Dean was looking for an attorney who could represent him in connection with joining other investors to buy real estate in or around 2004, he met John Pauciulo ("Pauciulo").

102.    Pauciulo, then an attorney at the Philadelphia law firm of White & Williams, held himself out as a specialist in corporate and securities law, and touted the fact that he was formerly an "enforcement lawyer" with the Securities and Exchange Commission.

103.    Thus began a long series of representations by Pauciulo of Dean and his businesses.

104.    During the first ten years of this representation (2004-2014), Dean experienced increasing success and fundamentally relied upon the advice and guidance of Pauciulo (and the respective law firms he worked for) regarding every aspect of his business operations.

105.    As time progressed, Pauciulo became intimately familiar with and advisory towards all of Dean's personal and business affairs.

106.    Dean's success in the life insurance industry was unmatched, and he had received numerous awards recognizing his accomplishments.

107.    Dean was also a self-published author of a book called "A better financial plan" in 2016, which discussed the benefits of life insurance as part of a larger financial plan.

108.    Although the core part of Dean's business involved the sale of life insurance,  in search of providing other investment opportunities for his clients, Dean became familiar with "alternative investments."

109.    With the assistance of his long-time counsel, Dean began forming investment funds using private placement memorandum ("PPM") to allow smaller investors to invest in "alternative investments" by raising capital.

110.    These PPMs were created upon the advice of Pauciulo, who was employed by a large Philadelphia law firm and who also touted his expertise in securities laws.

111.    Dean's first investment fund was created by Pauciulo as early as 2004 and involved investment in real estate.

112.    This investment was highly successful and benefitted many clients of Dean's.

113.    In or around 2010, Pauciulo created Dean's first Life Settlement Fund, and at least 11 other life settlement funds were subsequently established over the following ten (10) years.

114.    In addition to the life settlement funds, and with the legal assistance of Pauciulo, Dean also created funds to invest in the Litigation Funding industry.

115.    In sum, Dean had a thriving financial business practice for years, separate from any business that dealt with Par Funding.

**E.    Following Pauciulo's Due Diligence in 2016, Dean himself, his Family as well as his  Clients Invest in  Par Funding**

116.    In the Spring of 2016, Dean first met "Joe Mack" at a Philadelphia area golf course.

117.    During that first encounter, Joe Mack ("Mack") explained he was in the "merchant cash advance" business, and that, essentially, his business would make "advances" to small and midsized businesses which need fast funding.

118.    Because of delays involved in securing conventional loans at banks, Mack explained, an entire market for such rapid funding was underserviced and ripe for investment opportunity. In exchange for such rapid advances, the merchants would assign the right to receive a portion of their accounts receivable.

119.    Mack explained that his company "Complete Business Solutions Group, LLC" (doing business as "Par Funding") was expert at deciding which merchants to make advances to, and was regularly collecting lucrative interest payments.

120.    During this golf-course encounter, and a subsequent meeting at Mack's Old City Philadelphia office, Mack was also interested to learn that Dean was in the business of looking for investment opportunities for his clients and was impressed with Dean's track record and reputation in the community.

121.    Following the initial encounters, Dean contacted his (by then) long-time trusted counsel, Pauciulo, to conduct a deep dive, due diligence background check on Par Funding, including the personal background history of all its principals, its financial condition and performance, its reputation for integrity, and all its business operations and cash advance practices.

122.    Pauciulo, by then a member at the Eckert Firm in its Philadelphia headquarters, took on the assignment, assuring Dean he was an expert at conducting such due diligence, and assured Dean he would do a thorough job. Unbeknownst to Dean, Par Funding and its principals had orchestrated a scheme to defraud the public, including Dean by concealing the identity of its principals and by manipulating Par Fundings' default rates.

123.    Against this backdrop, the SEC conducted its investigation into Par Funding and on July 24, 2020, filed the Complaint against Par Funding as well as Dean and his business and subsequently filed a TRO on July 27, 2020.

     **F.    The SEC Investigation Fails To Comply With Non-Discretionary
          Duties and Violated Dean's Constitutional Rights**

124.    The Securities and Exchange Commission's Enforcement Manual is not advisory—it codifies the internal rules that SEC staff are required to follow when conducting investigations and recommending enforcement actions.

125.    The cumulative failures to comply with these rules, especially when they violate constitutional protections, render them non-discretionary.

126.    Specifically, the investigative officials failed to comply with numerous specific required provisions of the Enforcement Manual.

127.    The Enforcement Manual §2.3.1, p. 12 obligates investigatory staff to coordinate with other regional offices to avoid duplication, ensure consistency, and benefit from existing investigative work.

128.    The Enforcement Manual requirement to work with other regional offices on related investigations is not discretionary, it is mandatory.

129.    At the time the SEC opened its case against Dean, the SEC's New York office had already spent three (3) years investigating Dean's business.

130.    The SEC in Miami was therefore not only aware that Dean was represented by legal counsel but that he was also cooperating with the SEC New York in its investigation.

131.     Dean's cooperation could have been easily confirmed.

132.    Indeed, as part of the SEC New York's investigation, Dean, through his counsel Pauciulo, had already provided eighty-thousand pages of documents and e-mails, including comprehensive bank records covering Dean, his wife, his children, and his companies' records.

133.    In addition, Dean had appeared for two full days of deposition testimony under oath.

134.    At those depositions, Dean testified about his business dealings, as a finder, with Par Funding.

135.    Moreover, Dean's testimony confirmed that despite Dean's suggestion to Par Funding to create PPMs in 2016, Par Funding didn't want to do that. *See* Dep. Vagnozzi, dated November 15, 2018, p. 248. attached hereto as **Ex. "14."**

136.    Evidence of Dean's good faith cooperation is also confirmed by the fact that Dean had agreed to five (5) tolling agreements, which not only showed his willingness to cooperate, but also that he had nothing to hide.

137.    Importantly, the records that Dean provided through his legal counsel showed that there was no fraud, no diversion, and no misuse of any investor funds.

138.    In sum, the SEC New York investigation confirmed that Dean was represented by a former SEC enforcement attorney and by Eckert Seamans, one of Philadelphia's largest firms and that he was a regulated professional cooperating in good faith, not a participant in an ongoing fraud.

139.    The SEC in Miami had access to those records, yet it ignored the overwhelming evidence of Dean's cooperation and integrity.

140.    The duty set forth in § 2.3.1 was not simply to make a database query; it was to consult the related office, to understand its findings, and to integrate those findings before

20

recommending emergency relief to a federal court that would seize Dean's assets and business holdings.

141.    By falsely claiming that Dean was not cooperating, the TRO was submitted under false pretenses, constituted an abuse of power and deprived Dean of constitutional due process.

142.    By failing to comply with its own mandated duties in connection with the investigation, a false narrative was created. A narrative that failed to consider that Dean was a victim of Par Funding's fraud and which failed to recognize that there was no emergency, no concealment, and no fraud as it relates to Dean and his businesses.

143.    The SEC in Miami did not provide Dean with a Wells Notice and opportunity to respond pursuant to Enforcement Manual §2.4, pp. 19–20.

144.    If ever, in the history of SEC enforcement, an individual deserved the opportunity to respond to a Wells notice, it was Dean.

145.    For three years he had been the subject of an exhaustive SEC New York investigation. During that period, he was represented by a former SEC enforcement. He produced more than 80,000 pages of documents and e-mails, sat voluntarily for two full-day depositions, signed five tolling agreements extending the statute of limitations, and even froze $500,000 in commissions at the SEC's request. Every action he took demonstrated transparency and cooperation.

146.    Those are precisely the "facts and circumstances" that § 2.4 instructs staff to weigh when deciding whether to issue a Wells notice. The provision exists to ensure fairness—to give cooperative respondents a chance to be heard before the agency wields its most punitive tools.

147.    Instead, the SEC Miami office bypassed that safeguard completely. It ignored the mountain of evidence showing Dean's good faith and invoked "emergency" powers as though he was an ongoing fraudster on the run.

148.    The failure to issue a Wells Notice under these circumstances is not discretionary; it is a mandated duty and the basic concept of due process. It summarily denied Dean the opportunity to respond before being branded a fraud.

149.    The SEC in Miami's refusal to afford Dean that right turned the Wells process from a promise of fairness into a weapon of destruction.

150.    The SEC Miami's reckless investigation further provided false and incomplete information that formed the basis for the TRO.

151.    Pursuant to Enforcement Manual §2.4, p. 20, there are limits on Emergency TROs.

152.    Section 2.4 is clear: an emergency TRO is reserved for ongoing fraud or imminent dissipation of assets—where delay would allow investor funds to vanish.

153.    There were no facts discovered during the SEC Miami's investigation that supported such a drastic measure against Dean or his business.

154.    On the contrary, the investigatory evidence supported that Dean's investor records were immaculate, that his investors who had invested in Par Funding in 2016, 2017 and 2018 were happy and that said investors not only had received the return of their principal investments but had also received their monthly interest payments.

155.    Under these circumstances, the SEC Miami's use of a TRO constitutes an abuse of process.

156.    Even if later investigations revealed fraud by Par Funding's management, that does not retroactively justify what the SEC Miami did to Dean.

157.    The SEC's Miami Office ignored Dean's cooperative record, the clean bank analysis, the absence of scienter, and failed to consider that Dean was a victim of Par Fundings' fraud, yet sought an ex parte TRO anyway based on false allegations that Dean was part of the ongoing fraud by Par Funding.

158.    Using the most extreme weapon against a cooperative target inverted the Manual's intent. It was not "prompt enforcement" to protect investors—it was a malicious effort to destroy Dean's life.

159.    The Enforcement Manual §3.2.9, pp. 51–52 could not be clearer: staff must preserve a complete and accurate investigative record—including all transcripts, exhibits, correspondence, and documents obtained or created during an investigation. That rule exists so the Commission can evaluate all evidence, favorable and unfavorable, before taking enforcement action.

160.    The SEC's Miami Office did the opposite. Rather than review or maintain the full body of material assembled by SEC New York—tens of thousands of pages of production, deposition transcripts, and exhibits—it cherry-picked isolated lines to fit a pre-set narrative.

161.    SEC Miami quoted the single word "alter ego" from hundreds of pages of SEC New York testimony while omitting the surrounding explanation that A Better Financial Plan was a legitimate company and Dean's personal brand. It also disregarded entire categories of exculpatory records that were already part of the New York file: the 2017–2019 correspondence with counsel, the investor disclosure letter, and the videos documenting reliance on the legal advice of Pauciulo.

162.    By presenting only fragments of that record, SEC Miami violated § 3.2.9's mandate to maintain and rely upon complete investigative files. The staff's selective handling of evidence

concealed years of cooperation and context that would have shown there was no ongoing fraud, no emergency, and no basis for a TRO as to Dean.

163.    If SEC Miami had adhered to its own record-keeping rules, the Commission would have seen that Dean was not a Par Funding insider at all but the most cooperative participant in the entire investigation—and the SEC's New York office had already proved it.

164.    The SEC's Miami Office also failed to consider that Dean had relied on his legal counsel's advice (*see* Enforcement Manual §4.1.1, pp. 69–70) in the preparation, drafting and submission of legal documents, including PPMs and Form D registration to comply with securities laws.

165.    SEC Miami's own complaint admits that Dean's attorney drafted and recommended the very structures now alleged to be fraudulent.

166.    By ignoring the legal effect of that reliance, SEC's Miami Office violated its own directive to evaluate the advice-of-counsel defense "fairly and in good faith," a defense that would have cleared Dean from any allegations of fraudulent conduct.

167.    In fact, the SEC's Miami office later brought an administrative enforcement action against Pauciulo and concluded that Pauciulo had given reckless legal advice to Dean.

168.    That filing confirms what the record readily available to the SEC's Miami Office already showed: Dean's conduct was guided by, and dependent on, counsel's advice.  Yet the SEC Miami staff disregarded it entirely.

169.    Most importantly, the SEC's Miami Office failed to consider Dean's willingness to cooperate as set forth in Enforcement Manual §6.1.1, pp. 95–97

170.    Dean's cooperation met every factor listed in the Commission's own policy.

171. Under § 6.1.1, such conduct should earn "cooperation credit" and a fair opportunity to be heard—typically through a Wells Notice or at least an interview—before any enforcement recommendation.

172. Instead, SEC's Miami office took the opposite course: ignoring years of cooperation, it treated Dean as an imminent threat, filing an ex parte TRO that destroyed his business and reputation in seventy-two hours.

173. The Manual's cooperation policy (§6.1.1) required staff to give full and fair consideration to such cooperation before recommending any enforcement action, yet SEC Miami treated transparency as a liability rather than a mitigating factor.

174. The SEC Miami office's decision to punish exemplary cooperation with a "death-sentence" TRO violated both the spirit and the letter of the Commission's cooperation policy.

175. Instead, the SEC's Miami Office ignored exculpatory evidence, misled the Court into believing Dean was part of Par Funding's fraud, all to secure a TRO under false pretenses that destroyed Dan's life in seventy-two hours.

## V.     DAMAGES

176. As a direct and proximate result of Defendant's conduct, Dean has sustained enormous damages, including millions of dollars in lost past and future income unrelated to Par Funding.

177. Dean also suffered serious and irreparable reputational harm.

178. A simple Google search of "Dean Vagnozzi" yields page after page of articles branding him a fraud.

179. This reputational carnage is permanent and has foreclosed Dean's ability to continue in his profession, regardless of his innocence.

180.    Dean further suffered from extreme emotional distress which has further impacted his life and familial relationships. He has suffered from severe bouts of insomnia, despair, and loss of professional identity.

181.    He has endured public humiliation, uncertainty, and financial stress.

182.    Considering documented income history, lost future earnings, and reputational destruction, Dean's damages are in the tens of millions of dollars

## COUNT I
## DEAN VAGNOZZI V. UNITED STATES OF AMERICA
## Negligence -Federal Tort Claims Act ("FTCA")

183.    The averments of the foregoing paragraphs are incorporated by reference herein as if set forth fully herein.

184.    At all times material hereto, the United States of America, through its employees and/or agencies owed a duty towards Plaintiff to comply with mandated rules and regulations and to properly investigate claims consisted with the law.

185.    The federal officials involved in the investigation are investigative federal officers as defined by §2680, in that they have the authority to administer oaths, subpoena witnesses, compel witness' attendance and subpoena or require the production of documents and other materials.

186.    Defendants breached said mandatory duties when it failed to comply with the laws and regulations regarding the investigation.

187.    As a direct and proximate result of these failures, Dean sustained damages.

**WHEREFORE**, Plaintiff, Dean Vagnozzi, requests judgment against Defendant for compensatory damages, punitive damages, costs, reasonable attorney's fees and such other relief as the Court deems just and proper.

## COUNT II
## DEAN VAGNOZZI V. UNITED STATES OF AMERICA
### Abuse of Process

188.    The averments of the foregoing paragraphs are incorporated by reference herein as though set forth fully at length herein.

189.    At all times material hereto, the federal officials acted under the color of authority, and abused legal process.

190.    At all times material hereto, the federal officials were investigative or law enforcement officers, as defined by 28 U.S.C. §2680(h).

191.    Defendant's federal officials used a legal process against Dean when it filed a Temporary Restraining Order ("TRO") on July 27, 2020.

192.    The process was used primarily to accomplish a purpose for which the process was not designed, in that it was not intended to protect investors but rather foreclose Defendant's ability to assert legal defense and to completely shut Dean's business down.

193.    The process was not instituted for a legitimate object and was instituted for the purpose to benefit Defendant, which is not an authorized goal of the procedure.

194.    As a proximate and direct result of Defendant's actions Dean sustained damages.

**WHEREFORE**, Plaintiff Dean Vagnozzi requests judgment against Defendants in their individual capacities for compensatory damages, punitive damages where allowed, costs, reasonable attorney's fees (if applicable), and such other relief as the Court deems just and proper.

<u>COUNT III</u>
**DEAN VAGNOZZI V. AMY BERLIN AND UNNAMED FEDERAL OFFICIALS**
<u>Constitutional Violation -Bivens Action-</u>

195.    The averments of the foregoing paragraphs are incorporated by reference herein as though set forth fully herein.

196.    At all relevant times, Defendants unnamed federal officers were acting under color of federal authority and acting in their individual capacities.

197.    Dean possessed protected liberty and/or property interests secured by the Fourth Amendment and/or due process rights pursuant to the Fifth Amendment to the United States Constitution.

198.    The Defendants unnamed federal officers directly infringed upon Plaintiff's right against unreasonable searches or seizures pursuant to the Fourth Amendment.

199.    Defendants unnamed federal officials, acting individually and in concert, deprived Plaintiff of these protected interests without due process of law, including but not limited to failing to provide adequate notice, meaningful opportunity to be heard, and fair procedures required by the constitution, and/or engaged in conduct that was arbitrary, conscience-shocking, and an abuse of governmental power.

200.    Defendants' unnamed federal officials' actions were intentional, willful, malicious, reckless, and/or deliberately indifferent to Dean's constitutional rights.

201.    No other remedy exists for the constitutional violation.

202.    As a direct and proximate result of Defendants unnamed federal officials' unconstitutional conduct, Dean suffered serious damages including emotional distress, loss of liberty/property, reputational harm, economic injury, and other compensable harms.

**WHEREFORE**, Plaintiff Dean Vagnozzi requests judgment against Defendants unnamed federal officials in their individual capacities for compensatory damages, punitive damages, costs, reasonable attorney's and such other relief as the Court deems just and proper.

## VI.    JURY TRIAL DEMANDED

203.    Plaintiff hereby requests a trial by jury pursuant to Fed R. Civ P. 38 on all issues so triable.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

*/s/ George Bochetto*

Date: December 8, 2025                    By: _____
                                                                        George Bochetto, Esquire (27783)
                                                                        1524 Locust Street
                                                                        Philadelphia, PA 19102
                                                                        (215) 735-3900
                                                                        gbochetto@bochettoandlentz.com
                                                                        *Attorney for Plaintiff*